IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| GARRY BROOKS, ) | |
| ) | 8:07CV497 |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | MEMORANDUM AND ORDER |
| SOCIAL SECURITY ADMINISTRATION, ) | |
| Michael J. Astrue, Commissioner, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court for resolution of Garry Brook's appeal of a final determination of the Commissioner of the Social Security Administration denying his application for Social Security Disability and Supplemental Security Income benefits under Title XVI of the Social Security Act. This court has jurisdiction under 42 U.S.C. § 405(g). Upon review of the record and applicable law, the court concludes that the decision of the Commissioner is affirmed.

**BACKGROUND**

Garry Books ("Brooks") protectively filed an application for supplemental security income ("SSI") benefits on September 18, 2002. *See* Filing No. 7 (no hyperlink available), Social Security Transcript ("Tr.") at 53. His application was denied initially and again on reconsideration. Tr. 33-36, 38-42. On September 21, 2004, an Administrative Law Judge ("ALJ") found that Brooks was "not disabled." Tr. 222-227. The Appeals Council remanded the case to another ALJ for further development of the record on June 17, 2005. Tr. 237-240. After a second administrative hearing, ALJ James Francis Gillet again found that Brooks was "not disabled" on January 13, 2006. Tr. 370-439, 16-26. The Appeals

Council denied Brooks' request for review on October 29, 2007, making the decision of the ALJ the final decision of the Commissioner and subject to judicial review under 42 U.S.C. § 405(g).  Tr. 5-8.  Brooks' complaint followed.  *See* Filing No. 1.

Garry Brooks was born on February 2, 1955, and was 50 years of age at the time of his last administrative hearing.  Tr. 17, 53.  He claims an amended onset date of March 17, 2003, due to depression, stomach problems, and hiccups.  Tr. 373, 59.  Brooks reports that he has been unable to work since the onset of his disability.  Tr. 338.  He has a long history of polysubstance abuse including alcohol, marijuana, heroine and cocaine.  Tr. 99, 113, 120.

While Brooks had previously lived with his mother, when he testified during his second administrative hearing he had been living on his own for approximately four months.  Tr. 371-2.  Brooks reports that he experiences anxiety reactions two to three times per week lasting from three to four hours.  Tr. 83.  He has reported that he has no money or insurance for treatment, but he has received food stamps.  Tr. 284, 348.  Overall, Brooks' daily activities have been quite limited.  He does not visit or engage in social activities, but he is capable of heating left over meals; he can do some laundry and wash dishes.  Tr. 80.  He does not drive, and he has spent most of his time in the basement by himself.  Tr. 81.  He is able to dress himself and fix breakfast, but he does not do his own grocery shopping since he continuously seeks to avoid being around people.  Tr. 318.  He has testified that possibly once per month he will go out alone.  Tr. 351.

Samuel Moessner, M.D., a consulting physician, met with Brooks on October 30, 2002.  At that time, Brooks complained of loss of concentration and some low back and right knee discomfort.  Tr. 112.  Brooks reported that he had a long history of depression

that dated back to his adolescence. Tr. 113. He also reported having used a gram of cocaine once a week and consumed a pint of whiskey per week for an extended period of time during his life. Tr. 113. Brooks, however, did not smell of alcohol or other substances at the time of this appointment. Tr. 115. Ultimately, Dr. Moessner assessed a history of depression and anxiety, along with ongoing polysubstance abuse including both illicit drugs and alcohol. Tr. 118.

On the same day, Brooks presented to Barbara Schuett, M.A., an additional consulting clinical psychologist, for a psychological interview. Tr. 119. At that time, Brooks reported his drug use to include marijuana, heroin, cocaine, acid, and alcohol. Tr. 120. Brooks admitted that he continued to use alcohol and cocaine. Tr. 120. He reported feeling down, having weird thoughts, frustration, trouble sleeping, and isolating himself. Tr. 121. Ms. Schuett attributed these symptoms to a mood disorder explained by his recent decline in alcohol and drug use, rather than a depressive disorder. Tr. 121. Furthermore, Ms. Schuett opined that Brook's judgment and insight were poor as a result of his continued use of cocaine and alcohol. Tr. 122. Ms. Schuett assessed alcohol dependence in sustained partial remission, alcohol induced mood disorder, cocaine dependence in sustained partial remission, cocaine induced mood disorder, opioid dependence in sustained full remission, and cannabis abuse in sustained full remission. Tr. 123. She assigned a GAF of 55.[1]  *Id.*

---

[1] The Global Assessment of Functioning ("GAF") Scale is a rating system for reporting the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association *Diagnostic and Statistical Manual of Mental Disorders,* Fourth Edition, Text Revision (DSM-IV-TR) 34 (4th ed. 2000). A score of 50 or lower indicates "serious symptoms (e.g., suicidal ideation, severe obsession rituals, frequent shoplifting) or any serious impairment in social occupational or school functioning (e.g., no friends, inability to keep job)." *Id.* at 34.

Brooks then visited Douglas County Department of General Assistance in March of 2003, when he reported difficulty sleeping and a two-year history of depression. Tr. 109. He was prescribed Zoloft and Trazodone. Tr. 109. A month later, Brooks returned to General Assistance and indicated that Trazodone helped him sleep and he had felt better during the day. Tr. 105. He reported stopping the Zoloft because he believed it caused his nose to bleed. Tr. 105. At that time, he reported he had been clean from cocaine for five years. Tr. 106.

When Lorene Riedler, M.D., Brook's treating physician, saw Brooks on May 1, 2003, he described his condition as feeling depressed. Tr. 99. Dr. Riedler reported that Brooks appeared to isolate himself from others and was anxious at the time. Tr. 99. Brooks admitted a 25-year history of drug/alcohol dependence but reported no use in the prior couple months. Tr. 99. He denied having abused any drugs since 1999 and stated that he had done well since then. Tr. 101. A drug screen taken on May 1, 2003, returned a negative result. Tr. 193. Dr. Riedler reported that Brooks' insight was very poor and she noted that compliance could be an issue. Tr. 100. Dr. Riedler assessed a single episode of moderate to severe major depression and polysubstance dependence in remission, and she assigned a GAF of 40. Tr. 196. Brooks returned to General Assistance in June 2003, and reported that he felt okay–denying any use of alcohol or drugs. Tr. 168. It was then that Brooks requested a referral to the Friendship day program. Tr. 180.

In January of 2004, Brooks reported to Dr. Riedler that he felt hopeless and reported that he got angry more frequently and fought a lot with his mother. Tr. 179. At that time, Brooks was only taking half of his prescribed Lexapro. Tr. 179. Dr. Riedler subsequently

4

switched Brook's prescription from Lexapro to Wellbutrin, and Brooks agreed to attend the Friendship Program.  Tr. 179.

On April 30, 2004, Dr. Riedler filled out a mental residual functional capacity assessment for Brooks. Tr. 199-201.  Dr. Riedler noted that Brooks suffered from depression and anxiety and was markedly limited in many capacities. Tr. 199-201.  Upon completing the assessment, Dr. Riedler concluded that Brooks had marked limitations in his ability to deal with work stress, to complete a normal workday due to psychologically based symptoms, to accept instructions from supervisors and co-workers, to perform activities within a schedule, to maintain regular attendance, to get along with co-workers without distracting them, and to maintain concentration, persistence, or pace. Tr. 199-201.  At that time, Dr. Riedler reasoned that Brooks would be disabled even if he was not under the influence of alcohol/drug abuse.  Tr. 201.  In making this judgment, Dr. Riedler concurrently noted that Brooks denied having any drug or alcohol problems since 1999.  Tr. 201.  One week later, Brooks tested positive for cocaine use.  Tr. 299.

In March of 2005, Douglas County Primary Health Care closed Brooks' chart, noting he had been noncompliant with his medication management.  Tr. 289.  In August of 2005, Robert Johnson Disability referred Brooks to Beverly Doyle, Ph.D., a treating physician who only saw Brooks on one occasion.  Tr. 306.  At that time, Brooks reported having nerve problems that started as early as 2001. Tr. 306.  He reported having trouble sleeping, no friends, isolating himself, and panic attacks.  Tr. 306.  Brooks told Dr. Doyle that he was then rarely drinking, but used to drink and use drugs regularly.  Tr. 306.  An MMPI revealed extreme scores in anxiety and depression, but Dr. Doyle noted that exaggerated responses made the test invalid.  Tr. 307.  Dr. Doyle assessed dysthymic disorder, panic attack with

agoraphobia, alcohol dependence in partial remission, cocaine dependence in full remission, and cannabis abuse in full remission; she assigned a GAF of 50.  Tr. 307.  Dr. Doyle then concluded that Brooks had marked limitations in his ability to deal with stress, to complete a normal workday due to psychologically based symptoms, to accept instructions from supervisors, to perform on schedule, and to get along with co-workers. Tr. 308-309.  She concluded that Brooks had marked difficulties in concentration and his ability to interact with the general public.  Tr. 310.  The doctor indicated that Brooks would remain disabled even if he discontinued his alcohol and drug abuse.  Tr. 310.

On October 21, 2005, Dr. Amy Corey, Ph.D., a consulting physician, evaluated Brooks at the request of ALJ James Francis Gillet.  Tr. 314.  Brooks reported that he drank one to two beers a week and said he last used cocaine a year and a half earlier.  Tr. 315. Brooks indicated the Wellbutrin had been helpful and he had been taking it for one year. Tr. 317.  He said he had last taken it a "few days" before the evaluation.  Tr. 317.  In regards to Brooks' substance abuse, Brooks mentioned that he had "taken drugs to help forget that he felt helpless and unworthy" once or twice in the preceding six months.  Tr. 317.  Brooks admitted that within the last six months, he had gotten "really stoned or wiped out on drugs."  Tr. 317-18.  On that same day, Dr. Corey assessed that Brooks' immediate memory was slightly impaired but his recent, remote memory was intact.  Tr. 318.  Dr. Corey found that he exhibited difficulty with simple mental arithmetic but was able to sustain attention and concentration during the interview.  Tr. 318.  Brooks' judgment was fair, but his insight was limited.  Tr. 318.  Dr. Corey also indicated that Brooks retained the ability to understand, remember and carry out instructions.  Tr. 319, 321.  Dr. Corey noted

that his ability to respond appropriately to others and to work pressures was moderately affected with marked limitations in his ability to interact with the public. Tr. 319, 321.

She further concluded that his dependence on alcohol and drugs impaired his judgment and affected his degree of social isolation. Tr. 319, 321. Ultimately, Dr. Corey reasoned that if Brooks completely abstained from alcohol and other drugs, he might be less anxious and more interested in social relationships, and he would be more likely to follow through on his counseling and medication. Tr. 319. At the conclusion of the examination, Dr. Corey assessed moderate major depressive disorder, alcohol dependence in sustained partial remission, cocaine dependence remission status unknown, heroin dependence in sustained full remission, and cannabis dependence remission status unknown. Tr. 319-20. Dr. Corey assigned a GAF of 49. Tr. 320.

As of the second administrative hearing, Brooks had last seen Dr. Riedler in March of 2004. Tr. 376. Brooks twice indicated that he had not had any mood or mind altering chemicals since May 1, 2003. Tr. 374, 379. Only after he had been questioned regarding a failed drug test for cocaine did he admit to his use of drugs. Tr. 388. Brooks also stated that his psychiatrist quit, and although he was given a new one, he did not know the doctor's name. Tr. 375-376. He stated that he did not attend a support group and had not attended the Friendship Program. Tr. 376. He explained that he could not afford transportation to Friendship but had not investigated whether they would pick him up for free. Tr. 377. Brooks claimed that he told Dr. Riedler he could not afford to go and she tried to get him bus tickets but he did not qualify. Tr. 377-378. He said he took his medication when he got nervous and frustrated, but reported that Trazodone made him sleep the whole day. Tr. 384.

Dr. Thomas England, a consulting medical expert for the Social Security Administration, testified that Brooks' impairments included major depressive disorder, anxiety disorder NOS, and ongoing substance abuse. Tr. 399-401. Dr. England testified that Brooks' continued use of alcohol was contrary to medical recommendation and there were other indications of compliance problems. Tr. 401. The medical expert concluded that Brooks would function above his current level if he complied with his medication and refrained from substance abuse. Tr. 403. Dr. England testified that, if Brooks was compliant with treatment and stopped using substances including alcohol, he would have none to mild limitations in activities of daily living, mild to moderate limitations in social functioning, and moderate limitations in concentration, persistence, or pace. Tr. 406.

Dr. England acknowledged that his testimony was inconsistent with the opinions of Brooks' two treating physicians, Drs. Doyle and Riedler. Tr. 408. However, Dr. England explained that Dr. Doyle's opinion was formed when Brooks was only partially compliant with medication, was not involved in counseling, and at a time when Dr. Doyle was under the impression that Brooks had discontinued to use substances. Tr. 407-08. Additionally, Dr. England testified that Dr. Riedler's opinion was also formed when she was under the impression that Brooks had not been using substances. Tr. 408. It was Dr. England's opinion that given compliance and non-use, Mr. Brooks did not meet or equal any psychological listing. Tr. 407.

Vocational expert Deborah Determan testified in response to a hypothetical question assuming an individual who could perform a full range of light work with a slightly limited ability to understand, remember, and carry out short, simple instructions and moderate limitations in the ability to understand, remember, and carry out detailed instructions. Tr.

8

429-430. The individual had a slightly limited ability to make judgments on simple work-related decisions and to interact appropriately with the public, co-workers, and supervisors. Tr. 430. In work place situations involving large numbers of co-workers, the individual was moderately limited in his ability to interact appropriately with the public and co-workers. Tr. 430. The hypothetical person had slight limitations in his ability to respond appropriately to work pressures in a usual work situation or changes in a work situation but would be moderately limited in a situation that involved a large number of people. Tr. 430. Ms. Determan testified that the hypothetical person could perform work as an inserting machine operator (DOT: 209.685-018) (10,000 positions nationally), a folding machine operator (DOT: 208.685-014) (10,000 positions nationally), a photographic machine operator (DOT: 207.685-018) (15,000 positions nationally), a counter clerk (DOT: 249.366-010) (18,000 positions nationally), an office helper (DOT: 239.567-010) (16,000 positions nationally), and a routing clerk (DOT: 222.687-022) (38,000 positions nationally). Tr. 431-432.

At the conclusion of the hearing, the ALJ directed Brooks to obtain a psychological evaluation to determine the impact of alcohol and/or drug abuse on Brooks' residual functional capacity. Tr. 437. That evaluation was performed on October 20, 2005, by psychologist Amy Corey. Her report and findings are set out in the Transcript at 314-323.

### ALJ'S FINDINGS

The ALJ concluded that Brooks had not engaged in substantial gainful activity since the onset of his disability and currently had no transferrable skills. Tr. 24-25. Further, the ALJ concluded that Brooks had "an impairment or a combination of impairments considered 'severe' based on the requirements in the Regulations, but no impairment reach[ed] the severity necessary to meet or equal any listing." Tr. 24-25. Noting the

"claimant's failure to follow his physician's orders undermines his credibility," the ALJ declined to accept Brooks' subjective observations regarding his own disability. Tr. 21, 24. In the absence of alcohol and drug abuse, the ALJ reasoned that Brooks had the following residual functional capacity:

> work consisting of a full range of light and unskilled work as defined in regulations.  Any such work should allow a slight limitation in the ability to understand, remember, and carry out simple instructions and a moderate limitation in the ability to understand, remember, and carry out detailed instructions; a slight limitation making simple judgments; and a slight limitation interacting with the public or coworkers.  However, in workplaces with large number of coworkers, the claimant would have moderate limitations based on the tendency to withdraw or isolate.  In addition, the claimant would have slight limitations interacting with supervisors; a slight limitation in the ability to respond appropriately to usual work pace changes, but this could rise to a moderate limitation in areas with large numbers of people.

Tr. 25.

Although the ALJ reasoned that there were no jobs "existing in significant numbers in the local or national economy," the ALJ concluded that "[b]ased on the claimant's exertional capacity in the absence of DA&A, and the claimant's age, education, and work experience, Medical-Vocational Rule 202.13, Appendix 2, Subpart P, Regulations No. 4 directs a conclusion of 'not disabled' in the absence of DA&A."  Tr. 25.  Thus, the ALJ concluded, the claimant was disabled, but "since DA&A is a material factor to a finding of disability," Brooks was not eligible for benefits.  Tr. 26.

## DISCUSSION AND ANALYSIS

Brooks now appeals the final decision of the ALJ, claiming the ALJ erred on four individual counts.  First, Brooks contends that the ALJ erred when he improperly weighed the medical evidence in the record and dismissed the testimony of his two treating

10

physicians (Drs. Reider and Doyle) that he would be disabled even if he abstained from substance abuse. Further, Brooks avers that there is no substantial evidence in the record to support the ALJ's conclusion regarding Brooks' residual functional capacity. Brooks also argues the ALJ erred when he relied on an inaccurate hypothetical submitted to the vocational expert. Finally, Brooks alleges that the ALJ lacks the necessary evidence to justify the ALJ's finding that Brooks was noncompliant.

The court has reviewed the record and applicable law, and as a result, has concluded that the ALJ's decision should be upheld.

**Law**

When reviewing a Social Security disability benefits decision, the district court does not act as a fact-finder, re-weigh the evidence, or substitute its judgment for the judgment of the ALJ or the Commissioner. *Bates v. Chater,* 54 F.3d 529, 532 (8th Cir. 1995). Rather, the district court will affirm the Commissioner's decision to deny benefits if it is supported by substantial evidence in the record as a whole. *Eback v. Chater,* 94 F.3d 410, 411 (8th Cir. 1996). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would accept it as adequate to support a decision." *Cox v. Apfel,* 160 F.3d 1203, 1206-07 (8th Cir. 1998). In determining whether the evidence in the record is substantial, the court must consider "evidence that detracts from the [Commissioner's] decision as well as evidence that supports it." *Warburton v. Apfel,* 188 F.3d 1047, 1050 (8th Cir. 1999) (internal quotations omitted).

The Social Security Administration has promulgated a sequential process to determine whether a claimant qualifies for disability benefits. *See* 20 C.F.R. § 404.1520(a) (1998); *Cox,* 160 F.3d at 1206. Under the Commissioner's regulations, the determination

involves a step-by-step analysis of the claimant's current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity and his or her age, education and work experience. 20 C.F.R. § 404.1520(a); *Flanery v. Chater,* 112 F.3d 346, 349 (8th Cir. 1997). The Commissioner determines: (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform. *Cox*, 160 F.3d at 1206.

At step three of the sequential evaluation, if the claimant is found to suffer from an impairment that is listed in the Appendix to 20 C.F.R. Part 404, Subpart P ("the listings") or is equal to such a listed impairment, the claimant will be determined disabled without consideration of age, education, or work experience. *Flanery,* 112 F.3d at 349. The listings specify the criteria for impairments that are considered presumptively disabling. 20 C.F.R. §§ 404.1525(a), 404.1520(d); 20 C.F.R. Pt. 404, Subpt. P, App. 1.

### 1. Whether the ALJ Improperly Dismissed the Testimony of Treating Physicians Drs. Riedler and Doyle

First, Brooks avers that the ALJ erred when he dismissed the testimony of Drs. Riedler and Doyle regarding his disability. Upon review of the record, the court finds that

the ALJ's decision to disregard these doctors' testimony was for good reason, as evidenced by the ALJ's findings on the record.

A treating physician's opinion that is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" will generally be given controlling weight.[2] *Reed v. Barnhart,* 399 F.3d 917, 920 (8th Cir. 2005); 20 C.F.R. § 416.927(d)(2). The treating physician's opinion is given this weight because of his "unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 416.927(d)(2). A treating physician's opinion, however, "does not automatically control, since the record must be evaluated as a whole." *Reed,* 399 F.3d at 920. Instead, the Eighth Circuit Court of Appeals has "upheld an ALJ's decision to discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Id.* at 920-21. Thus, "the regulations also provide that the ALJ must 'always give good reasons' for the particular weight given to a

---

[2]The regulations define "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairments." § 416.927(a)(2). "Treating source" is defined as the claimant's "own physician, psychologist, or other acceptable medical source" who provides the claimant with medical treatment or evaluation on an ongoing basis. § 416.902. By definition then, the controlling weight afforded to a "treating source" "medical opinion" is reserved for the medical opinions of the claimant's own physician, psychologist, and other acceptable medical source. The opinions of other medical professionals, though not "treating sources" as defined in the regulations, can be afforded treating source status if associated with a physician, psychologist, or other acceptable medical source as part of a team approach to treatment. *See Shontos v. Barnhart,* 328 F.3d 418, 426 (8th Cir. 2003) (giving treating source status to the group of medical professionals, including therapists and nurse practitioners who worked with claimant's psychologist, where the treatment center used a team approach).

13

treating physician's evaluation." *Singh v. Apfel,* 222 F.3d 448, 452 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2)).

In dispensing with the medical opinions of both of Brooks' two treating physicians, the ALJ properly noted the inconsistencies in their opinions as well as the "better or more thorough medical evidence" that supported his departure from their medical opinions. Specifically, the ALJ found that "the assessment of Lorene Riedler, M.D., the claimant's treating physician, who opined that the claimant had multiple marked limitations is only worthy of weight when considering the effects of DA&A, but little weight in the absence of DA&A . . . it appears that this psychologist thought that the claimant had not used DA&A since 1999." Tr. 19. Additionally, the ALJ reasoned that Dr. Doyle did not fully appreciate Brooks' substance abuse when she formed her medical opinion. The ALJ noted that "the psychologist apparently thought that the claimant only 'occasionally' used alcohol when opining that the claimant had multiple marked limitations that seriously reduce the claimant's ability to work. When considering Dr. Doyle's assessment, the [ALJ] finds that her lack of detail addressing the claimant's substance abuse is only consistent with the medical evidence of record considering the effects of DA&A." Tr. 18-19.

Substantial evidence on the record supports the ALJ's departure from the doctors' medical opinions in this instance. The doctors' own reports indicate their misconception that Brooks was not abusing substances at the time they formed their medical opinions. Tr. 201, 306-07. Further, the record shows that less than two weeks after Dr. Riedler reported Brooks had not abused drugs in five years, Brooks tested positive for cocaine. Tr. 299. Similarly, while Dr. Doyle reported on August 1, 2005, that Brooks only drank "rarely" and "used to regularly . . . use drugs," the record indicates that Brooks told Dr.

Corey on October 20, 2005, that he had "'taken drugs' . . . once or twice in the last six months." Tr. 307, 317. These noted inconsistencies, therefore, support the ALJ's conclusion that he should rely on the more thorough medical opinions of those doctors who fully appreciated the claimant's substance abuse.

Further, Brooks argues that the ALJ erred when he relied on the testimony of the Social Security's Administration's consulting medical expert, Dr. England. This contention, however, is misplaced. Brooks avers that "[r]eliance on non-examining, non-treating physicians is error." "The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole." *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). However, "an ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence." *Prosch v. Apfel*, 201 F.3d 1010, 1014 (8th Cir. 2000)(internal quotations omitted). If the ALJ determines that the medical opinions of expert non-treating physicians "are supported by better or more thorough medical evidence," the ALJ is entitled to consider those medical opinions in making his disability determination. *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir. 1997); *Ward v. Heckler*, 786 F.2d 844, 847 (8th Cir. 1986) (affirming the ALJ's decision to rely on the medical opinions of nontreating physicians where "the reports of the consulting physicians were both detailed and thorough.").

The record provides substantial evidence that Dr. England's medical opinions were supported by "better or more thorough medical evidence." Dr. England's testimony at the administrative hearing indicates that he, in contrast to Drs. Riedler and Doyle, understood that Brooks had not ceased abusing drugs and alcohol, as he testified that "absent

15

substance abuse use, and . . . with compliance, [Brooks] would be functioning at a higher level." Tr. 403. Furthermore, the ALJ did not rely on the medical opinions of Dr. England alone; rather, the ALJ also accorded significant weight to other "state agency phsycians . . . considered 'experts' under the Regulations." Tr. 22. He also attributed "significant weight" to the opinion of consulting physician Dr. Corey "who opined that the claimant would be less anxious and more interested in social relationships if he followed through on his medication and counseling and avoided DA&A." Tr. 22-23. The record, therefore, fully supports the ALJ's determination of "no disability" based on the medical opinions of Dr. England and other experts.

## 2. Whether Substantial Evidence Supports the ALJ's Finding of Residual Functional Capacity

Additionally, Brooks contends that the ALJ erred when he evaluated Brooks' residual functional capacity ("RFC") without adequately considering the "numerous marked limitations" that both Drs. Riedler and Doyle reported Brooks exhibited in relation to his "substantial gainful activity." Upon review of the record and applicable law, the court concludes that the substantial evidence in the record supports the ALJ's RFC determination.

Because the ALJ determined that Brooks has a severe mental impairment that neither meets nor is equivalent in severity to any mental impairment listing, the ALJ was then required to assess Brooks' residual functional capacity. 20 C.F.R. § 404.1520a(d)(3); *Baldwin v. Barnhart,* 349 F.3d 549, 556 (8th Cir. 2003) ("[T]he ALJ bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence.") (internal quotations omitted). "A claimant's RFC is what he or she can do

16

despite his or her limitations." *Id.* (citing 20 C.F.R. § 404.1545). In determining RFC, the ALJ must consider the effects of the combination of both physical and mental impairments. *Id.* The Social Security Act requires the Commissioner to consider the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient medical severity to be disabling. *Cunningham v. Apfel,* 222 F.3d 496, 501 (8th Cir. 2000); 20 C.F.R. § 404.1523. "In evaluating a claimant's RFC, the ALJ is not limited to considering medical evidence, but is required to consider at least some supporting evidence from a professional." *Baldwin*, 349 F.3d at 556 (citing 20 C.F.R. § 404.1545(c)).

Thus, the court finds that it was not error for the ALJ to refrain from relying on the medical opinions of Drs. Riedler and Doyle in forming his RFC determination. The record provides substantial evidence that the ALJ fully considered the "effects of the combination of both physical and mental impairments" and "some supporting evidence from a professional." Tr. 18-19. While the ALJ did not adopt the medical opinions of Brooks' two treating physicians (stating that Brooks would still be disabled even in the absence of DA&A), the ALJ adequately explained his good reason for doing so. As previously explained above, the record substantiates the ALJ's explanation that Drs. Riedler and Doyle's medical opinions were based on misinformation that Brooks was substance-free when he was in their offices for evaluation. In light of these noted inconsistencies and errors in their reports, the ALJ was fully justified in relying on medical evidence from other professionals, such as Drs. Corey and England. *See Reed,* 399 F.3d at 920-21 ("[W]e have upheld an ALJ's decision to discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough

medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.")(internal quotations omitted).

### 3. Whether the ALJ Committed Error by Submitting the Hypothetical to the Vocational Expert

Brooks also argues that the ALJ erred when he relied on the vocational expert's testimony since, as Brooks argues, the hypothetical posed to the vocational expert was "inadequate and did not properly incorporate the restrictions set forth by the testimony of Plaintiff or the opinions of treating psychiatrist and consulting psychologists." The court has reviewed the record and applicable law, and consequently, the court finds that Brooks' arguments regarding the hypothetical posed to the vocational expert are without merit.

First, the court has already addressed the ALJ's dismissal of the "restrictions set forth by the . . . opinions of treating psychiatrist [Dr. Riedler] and consulting psychologists [Dr. Doyle]." For the reasons stated above, this court finds that the ALJ's reasons for his dismissal of these doctors' opinions are both explained and supported by the substantial evidence on the record, and thus the court will not invalidate the challenged hypothetical based on this issue alone.

Further, the court also finds that the ALJ did not err in refusing to consider Brooks' own testimony regarding his disability. Instead, the record provides substantial evidence that the ALJ was justified in his decision to dismiss Brooks' subjective testimony. *Stephens v. Shalala*, 46 F.3d 37, 39 (8th Cir.1995) ("Where there are inconsistencies in the evidence as a whole, the [ALJ] may discount subjective complaints."). Additionally, if the ALJ finds that the claimant has not been compliant with prescribed medical treatment, the ALJ is justified in disregarding the claimant's subjective testimony regarding his or her disability.

18

See *Holley v. Massanari*, 253 F.3d 1088, 1092 (8th Cir.2001)(holding that an ALJ may consider noncompliance with medical treatment in his decision to dispense with claimant's subjective complaints); *Guziewicz v. Barnhart*, 114 Fed.Appx. 267, 269 (8th Cir. 2004) (holding that where claimant "had been noncompliant with prescribed medical treatment, including advice to quit smoking," ALJ was justified in determining that claimant's subjective statements were not credible).

In the instant case, the ALJ has found that "the claimant's failure to follow his physician's orders undermines his credibility." Tr. 21. Furthermore, the record is full of inconsistencies regarding Brooks' testimony. At the administrative hearing, Brooks testified that he had not taken any "mood or mind altering chemicals" since May 1, 2003; however a drug test on May 11, 2004, showed that Brooks tested positive for cocaine. Tr. 299, 374. Thus there is substantial evidence on the record to support the ALJ's determination that Brooks' testimony regarding his disability is not credible.

### 4. Whether the ALJ's Consideration of Defendant's Noncompliance Was Proper

Brooks avers that the ALJ's reliance upon his determination that Brooks was noncompliant with treatment constituted error because, due to Brooks' poor insight, Brooks did not fully understand his own obligation to comply with the doctors' prescribed treatments. The court finds this point moot, however, since even if the ALJ's determination that Brooks was noncompliant was in error, the ALJ was still justified in dispensing with Brooks' subjective testimony due to his numerous inconsistencies in the record. *See Stephens*, 46 F.3d at 39.

## CONCLUSION

For all of the aforementioned reasons, the court finds the ALJ's decision is supported by substantial evidence on the record. This court thus affirms the final decision of the Commissioner of the Social Security Administration. Accordingly,

IT IS ORDERED that the decision of the Commissioner is affirmed.

DATED this 6th day of March, 2009.

BY THE COURT:

s/ Joseph F. Bataillon
Chief District Judge